282 N.J. Super. 409 (1995)
660 A.2d 539
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
AMBROSE HARRIS, DEFENDANT-APPELLANT-CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 24, 1995.
Decided June 12, 1995.
*411 Before Judges SHEBELL, SKILLMAN and WALLACE.
Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant-cross-respondent (Susan L. Reisner, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).
Maryann K. Bielamowicz, Mercer County Prosecutor, argued the cause for respondent-cross-appellant (Ms. Bielamowicz, of counsel and on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
The primary issue presented by this appeal is whether a trial court should consider the racial demographics of the county in which a crime was committed in selecting the county from which to draw a foreign jury.
Defendant is a black man charged with a capital murder. The victim was a young white woman who was raped and then murdered when she came into the City of Trenton in December of 1992 to paint a mural. The victim's body was located on February 18, 1993, and defendant was charged with the murder shortly thereafter. Subsequent to that time, this case has been the *412 subject of extensive and continuous newspaper coverage in Mercer County, including a series of highly inflammatory articles published in the Trentonian, a daily newspaper distributed in Mercer County and the immediately adjoining area.
Based on this pretrial publicity, defendant made a motion for a change of venue or the impanelling of a foreign jury. The trial court concluded that a foreign jury was required because the Trentonian's "vengeance-seeking crusade" against defendant was so "constant," "prolonged," and "sensationalized" that there was a "likelihood of its taint permeating the trial." The court also determined to impanel a foreign jury rather than to change venue because "virtually all of the witnesses who will appear at the time of trial are located in Mercer County." However, the court rejected defendant's request for a foreign jury drawn from Camden County, which has "black-white demographics" that are nearly the same as those of Mercer County, because Camden County is not contiguous to Mercer County. Instead, the court decided, referring to reasons of "convenience" and "economy of time," that the foreign jury should be drawn from Hunterdon County. An order memorializing this ruling was entered on April 5, 1995.
Defendant filed an emergent motion for leave to appeal from the part of the order designating Hunterdon County as the source from which the foreign jury will be drawn, and the State filed a cross motion for leave to appeal from the part of the order requiring the impanelling of a foreign jury.[1] We granted both motions on April 13, 1995, and set an accelerated schedule for briefing and argument.

I
Since a reversal of the order requiring a foreign jury would make it unnecessary to consider defendant's appeal from the part of the order designating Hunterdon County as the source *413 of that jury, we consider the State's cross appeal first. Rule 3:14-2 authorizes a change of venue or trial by a foreign jury "if the court finds that a fair and impartial trial cannot otherwise be had." A trial court should grant such relief "where it is `necessary to overcome the realistic likelihood of prejudice from pretrial publicity.'" State v. Biegenwald, 106 N.J. 13, 33, 524 A.2d 130 (1987) (quoting State v. Williams, 93 N.J. 39, 67-68 n. 13, 459 A.2d 641 (1983)). The "realistic likelihood of prejudice" test serves to ensure that a defendant is afforded a fair trial by a panel of impartial jurors, as required by the Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961); State v. Koedatich, 112 N.J. 225, 267-68, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989). "[T]he trial court's responsibility under both the federal and State constitutions to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process is at its peak in cases involving the death penalty." State v. Williams, supra, 93 N.J. at 63, 459 A.2d 641; accord State v. Koedatich, supra, 112 N.J. at 282, 548 A.2d 939. In determining whether there is a "realistic likelihood of prejudice from pretrial publicity," our Supreme Court distinguishes between "cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, ... and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel." State v. Biegenwald, supra, 106 N.J. at 33, 524 A.2d 130. A trial court's decision that pretrial publicity has been so prejudicial that a change of venue or foreign jury is required will not be disturbed on appeal except upon a showing of an abuse of discretion. State v. Marshall, 123 N.J. 1, 76, 586 A.2d 85 (1991).
Although "[c]ases in which prejudice may be presumed due to pretrial publicity are relatively rare," State v. Koedatich, supra, 112 N.J. at 269, 548 A.2d 939, the trial court did not abuse its *414 discretion in concluding that this is such a case. The court found based on its review of various headlines, articles and editorials that the Trentonian has undertaken a "crusade" for imposition of the death penalty upon defendant:
The Trentonian ran headlines, many of them front page: "He Knows What He Did," "Ex-Inmate: Suspect Is A Loudmouthed Punk," "Huggins Suspect Would Kill You In A Heartbeat," "Profile Of A Monster  The Man Who Killed Kristen Huggins Committed His First Rape As A Teenager," "From Boy To Beast," "Artist Murderer Indicted In Robbery," "Huggins Slayer Terrorized Prison," "He's Satan In Disguise," "Artist Slayer Claims Innocence in Rapes," "Slobbering Killer Tells Judge `I Had to Spit,'" "Expert Says Rape Indictment Will Prompt Jury To ... KILL HIM!"
A February 24, 1993, Trentonian editorial confirmed that Ambrose Harris was no longer the subject of a news story, but rather the target of the newspaper's crusade:
"Harris has to have a trial and he has to be provided the best representation taxpayers' money can buy. That's what our justice system requires. Then there will be the usual appeals and further appeals.
But someday, years from now, if there is justice, the last appeal will have been rejected and the last day of sentence vacated.
On that day, Ambrose Harris,  cold-blooded murderer will be strapped to a prison gurney. A needle will be inserted into his arm and a lethal mixture of drugs will be injected into his veins.
Minutes later, one of the biggest pieces of human trash ever to blight Trenton's streets will be gone, and the world will be a far better place for his passing."
The trial court also noted that the Trentonian has a weekday circulation in Mercer County of approximately 60,000 newspapers.[2]
In addition to those articles mentioned in the trial court's opinion, we note that the Trentonian in other articles has included lengthy discussions of defendant's prior criminal record as well as other crimes he is suspected of committing. For example, one article detailed three rapes defendant is suspected of committing including one in which he allegedly told the victim that if she resisted he would do to her what he did to "that white woman." This same article also named defendant as the suspect in a bludgeoning death. Consequently, the Trentonian's coverage of *415 this case not only has been highly inflammatory but also has included a substantial amount of prejudicial information that would not be admissible at defendant's trial.
Moreover, the headlines and articles in the Trentonian routinely presume defendant's guilt. For example, one headline stated: "Artist's killer hears why he should die." The Trentonian also has published numerous comments by readers urging defendant's execution, some by public hanging. In all, the Trentonian has published more than 200 articles about the case, including thirty full front-page stories, many of which have been highly inflammatory. This coverage has continued unabated throughout the pendency of the case. Indeed, even the oral argument of this appeal generated a full front-page headline proclaiming: "JUSTICE FOR KRISTEN DELAYED AGAIN."
Therefore, there is more than adequate support in the record for the trial court's findings that the Trentonian, as part of a "vengeance seeking crusade" against defendant, has published a "stream of invective" that has been "constant," "prolonged" and "sensationalized," that there is a "likelihood of its taint permeating the trial," and that "the Trentonian will continue to foster vengeance." Accordingly, we affirm the trial court's decision that this case should be tried before a foreign jury.

II
We turn next to defendant's appeal from the part of the trial court's order designating Hunterdon County, rather than a county with racial demographics that more closely match those of Mercer County, as the source from which the foreign jury will be drawn.
Rule 3:14-2 does not set forth any criteria for the selection of a county for a change of venue or as the source of a foreign jury. The case law in this State does not provide any guidance either, although in State v. Zicarelli, 154 N.J. Super. 347, 381 A.2d 398 (App.Div. 1977), certif. denied, 75 N.J. 601, 384 A.2d 831 (1978), this court held that the Sixth Amendment requirement that a jury be drawn from a fair cross-section of the community was not *416 violated by a change of venue from Hudson County, which was predominantly urban, to Burlington County, which was predominantly rural. In Zicarelli, the defendant relied solely upon demographic statistics relating to education, income and occupation, which we concluded did not demonstrate that "residents of Hudson County constitute a distinctive group in the community such that their exclusion would deprive a jury drawn without them of its cross-sectional quality in violation of Sixth Amendment guarantees." Id. at 354, 381 A.2d 398. Zicarelli did not involve a claim that there were racial disparities between the jury pools in the county where the crime was committed and the county to which venue was changed. Moreover, since the defendant in Zicarelli relied solely upon the Sixth Amendment, we had no occasion to consider the requirements of the New Jersey Constitution regarding the selection of an appropriate county for a change of venue or the impanelling of a foreign jury, or the criteria which should govern a trial court's exercise of discretion under Rule 3:14-2.
However, in State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986), in the related context of a challenge to a prosecutor's use of peremptory challenges to exclude potential black jurors, the Supreme Court gave extensive consideration to the New Jersey Constitution's guarantee of the "right to trial by an impartial jury drawn from a representative cross-section of the community." Id. at 523, 511 A.2d 1150. The Court stated that the "principal rationale" for the requirement that a jury be drawn from a representative cross-section of the community is that "in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel *417 each other out." Id. at 524-25, 511 A.2d 1150 (quoting People v. Wheeler, 22 Cal.3d 258, 148 Cal. Rptr. 890, 897, 583 P.2d 748, 755 (1978)). The Court stated that the representative cross-section rule "also enhances the legitimacy of the judicial process in the eyes of the public by ... `legitimating the judgments of the courts, promoting citizen participation in government, and preventing further stigmatizing of minority groups.'" 103 N.J. at 525, 511 A.2d 1150 (quoting Wheeler, supra, 583 P.2d at 755 n. 6). The Court concluded that "[t]he representative cross-section rule ... must at least prohibit discrimination against ... discrete, cognizable groups," 103 N.J. at 526, 511 A.2d 1150, such as members of a particular race, and that a prosecutor's use of peremptory challenges "on grounds of presumed group bias" violates this rule. Id. at 529, 511 A.2d 1150.
We conclude that the same state constitutional policies which underlie the limitations that Gilmore imposes upon a prosecutor's use of peremptory challenges to exclude members of a particular race from a jury also require a trial court to consider racial demographics in exercising its authority under Rule 3:14-2 to change the venue of a criminal trial or to impanel a foreign jury. See Mallett v. Missouri, 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990) (Marshall J., dissenting from denial of certiorari) ("Just as state prosecutors may not use peremptory challenges to exclude members of the defendant's race from the jury, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), state trial courts may not transfer venue of the trial to accomplish the same result by another means."); State v. Williams, supra, 93 N.J. at 67 n. 12, 459 A.2d 641 ("[T]he use of foreign jurors in certain circumstances arguably may implicate the right of a defendant to be tried by a jury of peers."). If a trial court disregards racial demographics in selecting a county for a change of venue or as the source for impanelling a foreign jury, resulting in a jury pool with a significantly smaller percentage of a racial minority than would be generated in the county where the crime was committed, it will reduce the likelihood that the jurors ultimately *418 selected will be members of different groups whose "respective biases ... will tend to cancel each other out" in the course of jury deliberations. State v. Gilmore, supra, 103 N.J. at 525, 511 A.2d 1150. Such an exercise of judicial discretion also detracts from "the legitimacy of the judicial process in the eyes of the public," ibid., especially members of the minority group who are underrepresented in the jury pool. Cf. Georgia v. McCollum, 505 U.S. 42, 49, 112 S.Ct. 2348, 2354, 120 L.Ed.2d 33, 45 (1992) ("Public confidence in the integrity of the criminal justice system is essential for preserving community peace in trials involving race-related crimes."); see also People v. Goldswer, 39 N.Y.2d 656, 385 N.Y.S.2d 274, 278, 350 N.E.2d 604, 608 (1976) ("[W]ithin reasonable limits, the community to which the trial is transferred should reflect the character of the county where the crime was committed."); Simon v. State, 633 So.2d 407, 420 (Miss. 1993) (Bank, J., dissenting) (In choosing a transferee venue, "[t]he degree of change in the racial composition of the community from which the venire is to be selected is another factor which should be considered, at least in cases where the victim and defendant are of opposite races or race is otherwise a potential issue."), vacated on other grounds, ___ U.S. ___, 115 S.Ct. 413, 130 L.Ed.2d 329 (1994); see generally, An Ounce of Prevention: A Constitutional Prescription for Choice of Venue in Racially Sensitive Criminal Cases, 67 Tul.L.Rev. 1855 (1993).
Furthermore, if it were permissible for a court to completely disregard racial demographics in selecting a county for a change of venue or impanelling a foreign jury, it would create a serious risk that a defendant would be inhibited from asserting one constitutional right  the right to a trial before a jury that is untainted by prejudicial publicity  out of fear that the assertion of that right could result in the sacrifice of another constitutional right  the right to a trial before a jury composed of a representative cross-section of the community where the crime was committed. Cf. Young v. State, 770 S.W.2d 243, 245 (Mo. 1989) (where defense attorney withdrew a request for a change of venue based on prejudicial pretrial publicity because of concern that the case *419 would be transferred to a county containing few persons of defendant's race.).
A recent law review commentary cogently describes the fundamental policies relating to the fairness and public acceptance of the jury system that are served by requiring consideration of racial demographics in the selection of a county for a change of venue or impanelling a foreign jury:
Every change of venue makes it impossible to have members of the aggrieved community hear the case and apply their values to the proceedings. However, if a demographically similar community is chosen as the new venue, local values might be approximated, thereby preserving both the right to a fair trial and the key interests served by local community participation. Moreover, the reasons that favor local community participation in the jury also favor ensuring minority participation in the jury.... [A]lthough vicinage was meant to preserve cultural norms generated by geography, in the context of twentieth-century urban America, it should also preserve cultural norms generated by race.
[Note, Out of The Frying Pan or Into the Fire? Race and Choice of Venue After Rodney King, 106 Harv.L.Rev. 705, 715-16 (1993).]
Therefore, we hold that to protect a defendant's right to a jury that is reasonably comparable to one drawn from a representative cross-section of the community in which the crime was committed and to promote that community's confidence in the fairness of the trial, a trial court should consider racial demographics together with other relevant factors in selecting a county for a change of venue or as the source of a foreign jury.[3] Racial *420 demographics should be a particularly weighty factor in selecting the source of a foreign jury when the victim and the defendant belong to different races. See State v. Gilmore, supra, 103 N.J. at 536 n. 9, 511 A.2d 1150. Since the trial court selected Hunterdon County as the source of the jury that will hear this case based in part on its view that racial demographics should be disregarded in impanelling a foreign jury, we reverse that part of its order.
Moreover, in view of the significance of racial demographics in selecting the source of a foreign jury in a case such as this, we conclude that the court abused its discretion in requiring the jury pool to be drawn from Hunterdon County. The 1990 census indicates that there is a gross disparity between the racial demographics of Mercer and Hunterdon counties, with blacks comprising only 2.06% of the residents of Hunterdon compared to 18.87% of the residents of Mercer. At the same time, there are a number of other counties that are approximately the same distance from Mercer as Hunterdon that have much larger black populations: in Middlesex, 7.98% of the residents are black; in Monmouth, 8.54%; in Burlington, 14.31%; and in Camden, 16.24%.
We also disagree with the trial court's premise that only contiguous counties should be considered in selecting the county from which to draw a foreign jury. Although the traveling distance between the source of a foreign jury and the county in which a case will be tried is a relevant factor, it does not necessarily take longer to travel to a non-contiguous than to a contiguous county; in fact, defendant asserts that the roadway network leading into Trenton actually makes it easier to travel to Mercer from Camden than from certain contiguous counties. Consequently, the trial court erred in refusing to consider Camden County as a potential source from which to draw a foreign jury on the ground that it is not contiguous to Mercer County.
*421 However, we reject defendant's argument that this court should exercise its original jurisdiction by designating Camden County as the source from which to draw the foreign jury simply because it has racial demographics that are the closest match to Mercer of any nearby county. A court should not select the county from which to draw a foreign jury based solely on a comparison of racial statistics but should instead consider racial demographics together with all other pertinent factors. In particular, we direct the trial court's attention to the factors recently approved by the American Bar Association to determine the location to which venue should be changed:
(1) The nature and extent of pretrial publicity, if any, in the proposed venue;
(2) The relative burdens on the respective courts in changing to the proposed venue;
(3) The relative hardships imposed on the parties, witnesses, and other interested persons with regard to the proposed venue;
(4) The racial, ethnic, religious and other relevant demographic characteristics of the proposed venue, insofar as they may affect the likelihood of a fair trial by an impartial jury.

(5) Any other factor which may be required by the interests of justice.
[Criminal Justice Standards: Trial by Jury ABA Crim. Just. Sec. Standard 15-1.4 (3d ed. 1993) (emphasis added).]
The trial court should consider these same factors in selecting a county from which to draw a foreign jury, except that, in place of the third ABA factor governing a change of venue, the court should consider the hardship to prospective jurors in traveling from their home county to the site of the trial and the burden imposed upon the court in transporting the jurors.[4]
Accordingly, we affirm the part of order on appeal requiring the impanelling of a foreign jury but reverse the part designating Hunterdon County as the source from which the jury will be drawn.
NOTES
[1] Neither the State nor defendant challenges the trial court's decision to impanel a foreign jury rather than to change venue.
[2] As of the 1990 census, there were approximately 120,000 households in Mercer County.
[3] This conclusion is supported by the recent report of the Supreme Court's Ad Hoc Committee on Jury Selection in Criminal Cases, which concludes that "in view of the constitutional guarantee of a representative cross-section," a trial court which changes venue or impanels a foreign jury "should choose a new venue having a similar demography to the venue in which the crime occurred." 135 N.J.L.J. 1553, 1555 (1993). This committee's report recommends:

[T]he Court Rules [should] be amended to require the court, when selecting venue or choosing a foreign jury, to give appropriate consideration to a county with a similar demographic composition to that in which the crime occurred. The court's statement of reasons for its decision should include the court's evaluation of demographic considerations bearing on the selection of the new county.
[Id. at 1556.]
We are advised that the Supreme Court has approved the recommendations contained in this report but that the amendments to the court rules recommended by the committee have not yet been proposed.
[4] We do not pass on the question whether there are circumstances in which these considerations would be best served by selecting a foreign jury drawn from only a portion of a county or from a region comprising more than one county.