**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2562

_____

AMBROSE A. HARRIS,
                    Appellant
v.

*MICHELLE R. RICCI, Administrator, New Jersey State
Prison;
ATTORNEY GENERAL OF THE STATE OF NEW JERSEY

*(Substituted 3/31/10 pursuant to Rule 43(c), Fed. R. App. P.)

_____

On Appeal from the United States District Court
for the District Court of New Jersey
(D.C. No. 3-05-cv-04858)
District Judge: Honorable Anne E. Thompson

_____

Argued April 15, 2010

Before: SLOVITER and HARDIMAN, Circuit Judges,
and POLLAK[*], District Judge

(Filed: June 3, 2010)

____

Carl J. Herman
443 Northfield Avenue
2nd Floor
West Orange, N.J.  07052

_____

   [*] Hon. Louis H. Pollak, Senior Judge, United States District
Court for the Eastern District of Pennsylvania, sitting by
designation.

James K. Smith, Jr.  (Argued)
Office of Public Defender
Appellate Section
Newark, N.J.  07101

      Attorneys for Appellant

Daniel I. Bornstein  (Argued)
Office of Attorney General of New Jersey
Division of Criminal Justice
Trenton, N.J.  08625

      Attorney for Appellee

_____

OPINION OF THE COURT

_____

SLOVITER, *Circuit Judge*.

Before and during his state court trial for capital murder, Ambrose Harris was the subject of numerous inflammatory articles in two local newspapers, the *Trentonian* and the *Trenton Times*.  Ultimately, the court presumed prejudicial pretrial publicity.  Harris moved for a change of venue or, in the alternative, for a jury from another county (a "foreign jury").  The trial court adopted the alternative proposal.  Harris, who was convicted and unsuccessful in his state court appeal, filed a petition for a writ of habeas corpus in the federal district court claiming that the denial of his motion to transfer venue deprived him of his constitutional right to a fair trial.  Harris appeals the District Court's denial of his petition for a writ of habeas corpus.

## I.

### Background

Harris was indicted in June 1994 for having murdered

2

Kristin Huggins.[1] Due to the pervasive publicity surrounding the murder and his arrest, Harris moved the trial court to transfer his case from Mercer County, New Jersey, where the crime was committed, to a different venue or, in the alternative, for the impanelment of a foreign jury. More specifically, Harris argued that "a fair trial [could not] be had in Mercer County" because of highly prejudicial pre-trial media coverage by two newspapers – the *Trentonian* and the *Trenton Times* – which had a combined circulation in Mercer County of about 130,000. App at 59.

The trial court agreed with Harris that the "likelihood" that the "taint" from these sources would "permeat[e] the trial [could not] be ignored." App at 60. The trial court took particular note that the "intensity of [the] newspaper coverage [was] complicated by the vengeance-seeking crusade of the *Trentonian*" which generated a "stream of invective" that was "constant and prolonged and sensationalized," App at 60, and which "pander[ed] to its readers' worst instincts," App at 59.[2] Therefore, although the trial court denied Harris's motion for a change of venue, it granted his motion to impanel a foreign jury.

Harris filed an interlocutory appeal to challenge the trial court's decision to impanel a jury from Hunterdon County, and

---

[1] The facts of that heinous murder and its investigation were set out in some detail by the New Jersey Supreme Court. *See State v. Harris*, 716 A.2d 458, 463-66 (N.J. 1998). It is not necessary to recite those facts here in order to resolve the issue before this court.

[2] "The newspaper ran many front-page, invective-filled headlines: 'Ex-Inmate: Suspect is a Loudmouthed Punk,' 'Huggins Suspect "Would Kill You in a Heartbeat,"' 'Profile of a Monster: The Man Who Killed Kristin Huggins Committed His First Rape as a Teenager,' 'From Boy to Beast,' 'Huggins Slayer Terrorizes Prison,' 'He's Satan in Disguise.' Other news accounts discussed [Harris's] prior criminal record as well as other crimes he was suspected of committing. An editorialist predicted that death by lethal injection would rid society of 'one of the biggest pieces of human trash ever to blight Trenton streets.'" *State v. Harris*, 716 A.2d 458, 469-70 (N.J. 1998).

3

the State cross-appealed the trial court's decision to impanel a foreign jury in the first instance, arguing that it was unnecessary. The Superior Court of New Jersey, Appellate Division, held that "the trial court did not abuse its discretion in concluding" that "prejudice [in Mercer County] may be presumed due to pretrial publicity," and affirmed the trial court's decision "that th[e] case should be tried before a foreign jury." *State v. Harris*, 660 A.2d 539, 541-42 (N.J. Super. Ct. App. Div. 1995) (*Harris I*). However, the Appellate Division also held that the trial court should have considered whether the racial demographics of the county from which it would draw the new jury pool were comparable to the racial demographics of the community in which the crime was committed, and further found that the trial court had abused its discretion in selecting Hunterdon County as the source of the jury pool because the racial demographics of Hunterdon County differed markedly from those of Mercer County. *Id*. at 544-45. It then remanded for further proceedings. *Id*. at 545.

On remand, the trial judge decided to impanel jurors from Burlington County, a county contiguous to Mercer County, where the racial demographics generally matched those of Mercer County, and where the combined readership of the *Trentonian* and the *Trenton Times* was only around 22,000, divided fairly evenly between the two. *See State v. Harris*, 716 A.2d 458, 471-72 (N.J. 1998) (*Harris II*). The jury voir dire was conducted in Burlington County. During jury selection, Harris moved the trial court to change venue from Mercer County to Burlington County. In support of this motion, Harris submitted evidence that, among other things, the *Trentonian* was sold at sites near the Mercer courthouse. The trial court denied Harris's motion. Instead, each day of trial the jurors were transported by bus from the Burlington courthouse to the courthouse in Mercer. Meanwhile, "the inflammatory publicity continued throughout the trial[]."[3] *State v. Harris*, 859 A.2d 364, 429 (N.J. 2004)

---

[3] According to the New Jersey Supreme Court: "Dramatically prejudicial headlines were attendant to the guilt-phase deliberations. The *Trentonian* headlines read, 'One Juror Stalls Verdict,' and 'Battling Harris Jury Draws Public Fire.'

4

(*Harris IV*).

Harris was convicted and the jury recommended that he be sentenced to death. *Harris II*, 716 A.2d at 463. The New Jersey Supreme Court affirmed Harris's conviction and the jury's recommended death sentence. *Id*. at 498. The New Jersey Supreme Court held, in part, that "the selection of a jury composed of out-of-county residents, and [the trial court's] general questioning of the jurors during the trial concerning any exposure to trial publicity sufficiently ensured that defendant's trial was free of extraneous influences." *Id*. at 463. More specifically, the Court noted that in the past it had approved the use of a foreign jury as a "trial management technique[] . . . to ensure that a defendant's right to an impartial jury is not compromised," *id.* at 470, and it observed that "a change of venue has the same benefits and drawbacks as the impanelling of a foreign jury since both methods utilize jurors from communities where publicity may be less intense," *id*. (quoting *State v. Williams*, 459 A.2d 641, 656 n.13 (N.J. 1983)). Although the *Harris II* Court affirmed Harris's conviction, it stated that "[w]hen . . . a capital case is accompanied by a stream of public invective such as surrounded this case, it occasions us to reconsider our precedent," *id.*, and held that "[i]n future capital cases a court should change the venue of a capital trial when there is a realistic likelihood that presumptively prejudicial publicity will continue during the conduct of a trial," *id*. at 471. Later, the New Jersey Supreme Court undertook a separate "proportionality review" of the recommended death sentence and concluded that Harris's sentence was not disproportionate compared to other cases. *State v. Harris*, 757 A.2d 221, 307

---

A feature story quoted a Trenton resident as expressing the opinion that '[m]ost people figure the jury would think, "We'll have lunch on the county, and we'll squirt him-this afternoon."' Similar publicity continued during the penalty phase. A headline such as 'Ambrose Eyed in '67 Slay.' An editorial recommended death for Harris. The day after the jury returned its guilt verdict, a front-page photograph of Harris ran over a caption which read, 'So why's this killer smiling? Because he's seen juror No. 7 crying, and he thinks she'll never go for the death penalty.'" *Harris II*, 716 A.2d at 472.

5

(N.J. 2000) (*Harris III*).

Harris next petitioned for post conviction relief, making "multiple claims of ineffective assistance of counsel and assorted other challenges to the validity of his conviction and sentence." *Harris IV*, 859 A.2d at 374. His petition was eventually reviewed de novo and denied by the New Jersey Supreme Court.[4] *Id.* at 380, 449.

Thereafter, Harris filed a petition for a writ of habeas corpus in the New Jersey district court. *See Harris v. Cathel*, Civ. No. 05-4858 (AET), 2009 WL 539898, at *1 (D.N.J. Mar. 4, 2009) (*Harris V*). While the resolution of his petition was pending, New Jersey repealed the death penalty and New Jersey Governor Jon Corzine commuted Harris's death sentence to life imprisonment without the possibility of parole. *See id.* at *2. Harris thereafter abandoned all of his arguments based on the imposition of the death penalty, and pressed only the following claims that "flow from the Sixth Amendment's guarantee of a fair trial": (1) in light of the pretrial publicity surrounding the case, the trial court's use of a foreign jury deprived him of a fair trial; (2) the trial court should have taken more extensive precautions to ensure that the impaneled jurors were not infected by the mid-trial publicity; (3) the trial court should have held a hearing to explore allegations of contact between jurors and a former public defender; (4) the trial court should have allowed Harris to call a witness who would have testified that Gloria Dunn, who was Harris's accomplice in the murder of Kristin Huggins and who was the state's primary witness against Harris, was a violent person; and (5) his counsel was ineffective. *Id.* at *2, *7, *9. The District Court rejected all of Harris's arguments, denied his petition for a writ of habeas corpus, and denied Harris a certificate of appealability. *Id.* at *10. This court granted Harris's petition for a certificate of appealability, finding that the "sole claim presented [on] appeal [was] 'adequate to deserve

---

[4] The New Jersey Supreme Court found that because of some of the PCR "court's statements, and the bias, flippancy, and disdain they portray[ed,]" it would "afford no weight to any of its findings or conclusions." *Harris IV*, 859 A.2d at 378.

encouragement to proceed further,'" App. at 30 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)), and instructed the parties to brief "the issue of whether the New Jersey Supreme Court held contrary to, or unreasonably applied, 'clearly established Federal law,' *see* 28 U.S.C. § 2254(d)(1), in affirming the trial court's decision to impanel a foreign jury rather than transfer the case to a different venue in light of the pretrial publicity that surrounded the case," App at 30-31.[5]

## II.

## Analysis

Because this case arises from a state court proceeding in which the merits of Harris's sole claim on appeal were adjudicated, the standards established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. *See* 28 U.S.C. § 2241-2266. Harris is not entitled to a writ of habeas corpus unless the state proceedings "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)-(2). The certificate of appealability granted in this case is limited to the "contrary to" prong.

There has been considerable judicial commentary on the requirements imposed by AEDPA. "A state court decision . . . fails the 'contrary to' prong of AEDPA if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts." *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009) (citation omitted). "Similarly, a state court ruling is considered an 'unreasonable application' if the state court

---

[5] The District Court had jurisdiction under 28 U.S.C. § 2254(a). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." *Id.* (citations omitted).

The effect of extensive pretrial publicity has also been the subject of numerous decisions by the courts, including the Supreme Court. This court has noted the Supreme Court's holdings that "'adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed.'" *Flamer v. Delaware*, 68 F.3d 736, 754 (3d Cir. 1995) (en banc) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)).

The Supreme Court has also held that in some circumstances mid-trial publicity and courtroom events can result in a presumption of juror prejudice. *See Estes v. Texas*, 381 U.S. 532, 542-43 (1965) (jury prejudice assumed in part because trial was conducted in a circus-like atmosphere created by television and news media); *Sheppard v. Maxwell*, 384 U.S. 333, 355 (1966) (juror prejudice presumed in part because "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard."). Such a presumption arises, however, only when the "proceedings . . . [are] entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida*, 421 U.S. 794, 799 (1975).

The effect of pretrial publicity was also considered in *Rideau v. Louisiana,* 373 U.S. 723 (1963), where "the defendant had 'confessed' under police interrogation to the murder of which he stood convicted." *Murphy*, 421 U.S. at 799 (describing *Rideau*). "A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place." *Id.* In reversing the defendant's conviction, the Supreme Court in *Rideau* "did not examine the voir dire for evidence of actual prejudice because it considered the trial under review 'but a hollow formality' - the real trial had occurred when tens of thousands of people, in a community of

8

150,000, had seen and heard the defendant admit his guilt before the cameras." *Id.*

From this line of precedents, Harris argues that as a result of the trial court's finding uncontested on appeal that prejudicial pre-trial publicity by Trenton-based newspapers created a presumption of prejudice in Mercer County jurors, "clearly established federal law, as set forth by the Supreme Court, require[d] that the venue of the trial be moved away from the source of the publicity in order to protect petitioner's Sixth Amendment right to a fair trial by an impartial jury[.]" Appellant's Br. at 1. In other words, Harris argues that the Supreme Court cases hold that the only possible remedy for a finding of presumptive prejudice in a community due to pretrial publicity is a change of venue. No Supreme Court decision directly so states and we decline to view this argument as a natural extension of existing precedent.

Harris discounts the relevance of the jurors' affirmations that they had not been aware of the publicity, either pretrial or midtrial. He refers to the statements in the Supreme Court's decision in *Irvin v. Dowd*, 366 U.S. 717 (1961), where the Court stated that there was "[n]o doubt [that] each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father." *Id.* at 728. The Court held that "[w]here so many [jurors] so many times, admitted prejudice, [their] statement[s] of impartiality can be given little weight . . . .[because] [a]s one of the jurors put it, 'You can't forget what you hear and see.'" *Id. Irvin* is inapposite here. In *Irvin*, eight of the twelve jurors had formed an opinion that the defendant was guilty before the trial began; some went "so far as to say that it would take evidence to overcome their belief" in his guilt. *Id.*

It is important to recognize what Harris does not argue. To our knowledge, Harris has never argued that there was so much negative pretrial publicity in Burlington County, the residence of the foreign jurors, that prejudice should be presumed. Indeed, the trial court held that Burlington County was not so infected, and the New Jersey Supreme Court approved that holding. *See Harris II*, 716 A.2d at 472 ("The

9

principal risk of jury contamination in this case arose in Mercer [C]ounty and not in the home counties of the jurors."). Significantly, Harris himself had requested that the trial be transferred to Burlington County.

Nor does Harris argue that the trial court impaneled jurors who were actually biased as a result of the pretrial publicity. Such an argument would in fact be difficult to sustain in light of the New Jersey Supreme Court's findings on direct appeal that the trial court "took firm steps to ensure that none of those households that received the *Trentonian* (the newspaper containing the most inflammatory material) would be on this jury," and that "[a]ny juror who regularly read the *Trentonian* was effectively subject to elimination for cause in the jury selection process." *Id.*

In fact, Harris does not argue that the impaneled jurors were actually biased for any reason, whether due to exposure to publicity before or during the trial or otherwise. In any event, the New Jersey Supreme Court found on direct appeal that "the [trial] court ensured that during the course of the trial most jurors were assembled at the Burlington County Court House and transported directly to the Mercer County Court House with attempts to minimize the exposure to the hawking of papers en route to the court house." *Id.* The New Jersey Supreme Court further noted that "whenever [defense counsel] requested [during trial that] the court . . . question jurors concerning any prejudicial headlines and accounts, the court did ask the jurors to acknowledge by a show of hands if they had seen or read any news accounts of the trial and that on each of these occasions it received no response." *Id.*

Harris's argument is exclusively based on the trial court's determination that a presumption of prejudice against him arose as to the inhabitants of Mercer County because of their exposure to pretrial publicity. From that, Harris argues that any foreign jurors impaneled in Mercer County should *ipso facto* be presumed to be prejudiced. Harris relies on the Supreme Court decisions to argue that the statements by the foreign jurors during voir dire that they could be and were unbiased should be disregarded wholesale as untrustworthy, even when voir dire was

10

conducted within a community with little prejudicial pretrial publicity. He discounts the measures taken by the trial judge to prevent impaneling jurors who were biased and to shield the foreign jurors from being exposed to prejudicial media coverage during trial.

We cannot decide this case on the basis of the opinions on which Harris depends for his argument that once a court has found that "pretrial publicity in connection with a capital trial ha[s] . . . tainted the jury pool . . . the defendant [is] entitled as a matter of federal constitutional law to a change of venue to another county." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (citing *Irvin*, 366 U.S. 717). None of the Supreme Court cases that Harris relies on addressed, or even mentioned, the use of a foreign jury to ameliorate the effects of pretrial publicity. Even in the one opinion that has language that on its face appears to support Harris's position, *Groppi v. Wisconsin*, 400 U.S. 505 (1971),[6] the Court acknowledged that there "are many ways to try to assure the kind of impartial jury that the Fourteenth Amendment guarantees." *Id.* at 509. Neither *Groppi* nor *Rideau* considered whether the impanelment of a foreign jury could achieve the same end.

The same can be said of the courts of appeals decisions to which Harris cites. *See Gaskin v. Sec'y, Dep't of Corr.*, 494 F.3d 997, 1004 (11th Cir. 2007); *Goss v. Nelson*, 439 F.3d 621, 625 (10th Cir. 2006); *Daniels v. Woodford*, 428 F.3d 1181, 1210 (9th Cir. 2005); *United States v. Higgs*, 353 F.3d 281, 307 (4th Cir. 2003); *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999); *Pruett v. Norris,* 153 F.3d 579, 585-86 (8th Cir. 1998).

In any event, we cannot decide this case on the basis of any of those authorities because, as we noted at the outset, this case is governed by AEDPA. Harris must show that the New

_____

[6] In *Groppi*, the Court, citing *Rideau*, stated: "[o]n at least one occasion this Court has explicitly held that only a change of venue was constitutionally sufficient to assure the kind of impartial jury that is guaranteed by the Fourteenth Amendment." *Groppi*, 400 U.S. at 510 (discussing *Rideau*, 373 U.S. at 723).

11

Jersey Supreme Court's decision upholding the use of foreign jurors to ameliorate the effects of the pretrial publicity was contrary to law clearly established by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Even Harris concedes that the Supreme Court has never squarely considered this issue.

A recent decision of the Supreme Court illustrates its deferential approach to the state courts' decisions, even in the face of what appears to be its doubt about the merits of that decision. In *Renico v. Lett*, - - U.S. - - , 2010 WL 1740525, at *5 (May 3, 2010), the Court reviewed the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury "had deliberated for at least four hours following a relatively short, and far from complex, trial . . . ." The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. *Id.* at *4. The federal district court granted a writ of habeas corpus, and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity. *Id.* at *5

The Supreme Court reversed and its reasoning is instructive here. It stated that the question "is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law,'" and it later explained that the application must be "objectively unreasonable." *Id.* (citations omitted). In reversing the Court of Appeals, the Court stated in a footnote, "whether the trial judge was right or wrong is not the pertinent question under AEDPA." *Id.* at *9 n.3. It noted that the Michigan Supreme Court's decision, "while not necessarily correct - was not objectively unreasonable." *Id.* at *9.

Applying *Lett* to this case, our way is clear. Had Harris requested a change of venue at a federal trial, the federal court

12

likely would have granted it.  In fact, even the New Jersey Supreme Court used the opportunity to opine on the need to consider a venue change in the future under similar circumstances.  *See Harris II*, 716 A.2d at 471.  But this was not a federal, but a state, trial.  We cannot hold that the New Jersey courts' decision to impanel foreign jurors after taking careful steps to ensure an impartial and unbiased jury was an objectively unreasonable application of federal law.  We therefore will affirm the District Court's denial of Harris's petition for a writ of habeas corpus.

I append a statement by Judge Pollak, a member of this panel.

Pollak, *District Judge*.

I join the court's fine opinion. What is at issue in this profoundly unfortunate case is dictated by this court's grant of a certificate of appealability instructing counsel to address the question whether the affirmance by the New Jersey Supreme Court of "the trial court's decision to impanel a foreign jury rather than transfer the case to a different venue in light of the pretrial publicity" orchestrated by the *Trentonian*[7] constituted what 28 U.S.C. § 2254(d)(1) terms "an unreasonable application of[] clearly established Federal law[] as determined by the Supreme Court of the United States." Since, as the court notes, Harris does not "argue that the trial court impaneled jurors who were actually biased," what is at issue is whether any decision or line of decisions of the Supreme Court directs that "transfer to a different venue" should, as a matter of federal constitutional requirement, have been taken as a prophylactic measure, additional to utilizing jurors from another county, to minimize the danger that the pretrial publicity would generate juror bias. The court's opinion convincingly demonstrates that, thus far, no case decided by the Supreme Court has put in place such a constitutional mandate governing the procedures of state courts. The court rightly observes that "[h]ad Harris requested a change of venue at a federal trial, the federal court likely would have granted it." I would only add that if, under circumstances comparable to those obtaining at Harris's trial, a federal trial court were to decline to move the trial to another venue, it is to be hoped, and indeed expected, that a court of appeals would conclude that the trial court's ruling was an abuse of discretion. But the case before us is a state case, with respect to which we are required to view the state court's decision through the limiting prism of § 2254(d)(1). And therefore, as the court's opinion establishes, the District Court's denial of habeas corpus

---

[7] Dissenting in *State v. Harris,* 716 A.2d 458, 507 (1998) ("*Harris II*"), Justice Handler described the pretrial publicity this way: "A sea of horrendous, sensationalistic, and unremittant publicity engulfed this prosecution. The *Trentonian*, a daily tabloid newspaper, was the primary, almost exclusive, source of this unabated torrent."

14

must be affirmed.